**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

    **v.**                                                                        **11-CR-119-TJM-HBS**

**JASON GLADDEN,**

                **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

## DECISION & ORDER

**I.    INTRODUCTION**

Following a jury trial, Defendant JASON GLADDEN was convicted of the sole count of the Indictment charging him with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Defendant now moves for a judgment of acquittal or a new trial pursuant to Rules 29(c) and 33 of the Federal Rules of Criminal Procedure. The Government opposes the motion.

**II.    BACKGROUND**

The Indictment charged that, on or about October 6, 2010, in the City of Buffalo, New York, Defendant, having been previously convicted of a felony, "unlawfully did knowingly possess, in and affecting interstate or foreign commerce, a firearm, namely, a Winchester, Model 1300, 12 gauge shotgun, bearing serial number L2779361." At trial, the Government offered testimony from Shirell Hughes, Buffalo Police Department

1

Detective Brendan Kiefer, and forensic chemist Jodi Leudemann. Detective Kiefer testified that on October 6, 2010, he, along with several Deputy United States Marshals and New York State Parole Officers, went to 102 Freund Street, Buffalo, New York to locate and arrest Defendant on a parole violation.[1] Detective Kiefer located Defendant at this location, arrested him, and placed him in the backseat of Detective Kiefer's police cruiser. See 3/20/13 Tr. p. 37. The police cruiser was located outside of 102 Freund Street. Ms. Hughes, the owner of 102 Freund Street, consented to a search of the residence. In furtherance of that search, an officer led a police canine into 102 Freund Street. According to Detective Kiefer, when the officer and canine were in view, Defendant stated, in substance, that there were no drugs in the residence. Id. Detective Kiefer replied that the canine was present to search the residence for firearms, not narcotics. Id. pp. 37-38. Defendant then purportedly stated that there was a shotgun in the house, that it was for protection, and that it was "legal." Id. p. 38.

A Winchester, Model 1300, 12 gauge shotgun, bearing serial number L2779361, was recovered from a second floor bedroom closet at 102 Freund Street. The parties stipulated that this firearm was submitted to the Erie County Central Police Services Forensic Laboratory for analysis where it was swabbed for deoxyribonucleic acid ("DNA"). Ms. Leudemann, a forensic chemist from the Forensic Laboratory, testified that she developed DNA profiles from the firearm swab and a known buccal swab submitted by

---

[1] The evidence at trial demonstrated that Defendant had been declared an absconder from the terms of his parole with New York State.

Defendant.² Ms. Leudemann then compared the DNA profiles and concluded that Defendant's DNA was on the firearm and that the chance of randomly selecting an unrelated individual with the same DNA was 1 out of 9.5 billion. See 3/20/13 Tr. p. 82-83. Ms. Leudemann also testified that, based upon the DNA data, there were at least three individuals who touched the shotgun, and possibly up to eighteen. Id. pp. 84-89.

Ms. Hughes testified that she owned and resided at 102 Freund Street. When asked if anyone else was living at 102 Freund Street, she testified that her estranged husband's "stuff was still there," see 3/20/13 Tr. pp. 15-16;³ id. p, 23;⁴ that her brother "occasionally stayed there," id. p. 15; and that her 14-15 year old daughter lived there. Id. Ms. Hughes also testified that Defendant, who was friends with her brother,⁵ stayed at 102 Freund Street on occasion, including being there and "hanging out" with Ms. Hughes on October 6, 2010 when the police arrived. See id. p. 17. According to Ms. Hughes, her estranged husband, her daughter, and her brother had keys to the residence but Defendant did not. Ms. Hughes acknowledged, however, that Defendant had access to the residence and, at times, was inside the residence while she was at work. Id. p. 18. Ms. Hughes denied ever seeing the firearm that was found in an upstairs closet located in her bedroom. Ms. Hughes further testified that the closet where the gun was found was

---

²The parties also stipulated that an agent from the Bureau of Alcohol, Tobacco, Firearms and Explosives took a DNA sample from Defendant on January 24th, 2012, and then submitted that sample to the Erie County Central Police Services Forensic Laboratory for analysis.

³("In October, I don't think he was staying there but his stuff was still there — but he had access to the house.")

⁴(acknowledging that "in early October or late September, [Ms. Hughes' estranged husband] had gotten the boot from [Ms. Hughes]")

⁵Ms. Hughes testified that she and Defendant had a romantic relationship, but that it did not begin until after October 6, 2010 and ended a few months before the trial.

3

used by her estranged husband, and that, although she did not go into the closet, she knew that her estranged husband's belongings were stored in the closet at the time the police found the firearm. On cross-examination, Ms. Hughes acknowledged that, at times, her daughter brought friends to the house while Ms. Hughes was not home. Ms. Hughes also stated that her estranged husband was a hunter, and although she never saw him with the shotgun, she found a box of shotgun shells in the garage when she was cleaning it out with Defendant after Defendant was released from a term of incarceration.

The Government also offered the parties' stipulations that (a) the shotgun recovered in this matter was operable and considered a firearm under federal law; (b) the shotgun was manufactured outside the State of New York and therefore traveled in and affected interstate commerce prior to its recovery in this case; (c) Defendant had, prior to October 6, 2010, been convicted of a felony; and (d) no federal or state authority had granted Defendant a relief from civil disabilities such to make possession of the firearm by him lawful. After the Government rested, the Court denied Defendant's Fed. R. Crim. P. 29 motion.

On the defense case, Defendant took the stand to testify on his own behalf. He testified that, approximately two (2) weeks before October 6, 2010, he went into Ms. Hughes' estranged husband's bedroom closet looking for hair cutting clippers. While in the closet he observed a shotgun which he presumed belonged to Ms. Hughes' estranged husband. Upon discovering the firearm, and out of concern for the safety of the children who were frequently in the residence, Defendant picked up the shotgun to make sure it was not loaded. He then stood the shotgun in the back of the closet in a manner so it would not be easily knocked over. Defendant stated that he never told anyone about the

firearm in spite of his safety concerns because he did not have permission to be in the closet and did not want Ms. Hughes to think poorly of him for going in the closet. Defendant conceded that, on occasion, he stayed at 102 Freund, and that he had access to the bedroom where the firearm was located.

The jury was given instructions on the law applicable to this case, including the elements of the offense that the Government were required to prove beyond a reasonable doubt. As to the issue of possession, the Court instructed the jury:

> Possession includes both actual and constructive possession. A person who has direct physical control of something on or around his person is then in actual possession of it. A person who is not in actual possession, but who has both the power and the intention to exercise control over something is in constructive possession of it. Whenever I use the term "possession" in these instructions, I mean actual as well as constructive.
>
> If you find that the defendant either had actual possession of a firearm or that he had the power and intention to exercise control over a firearm, even though it was not in his physical possession, you may find that the government has proven possession.
>
> The law also recognizes that possession may be sole or joint. If one person alone possesses a firearm, that is sole possession. However, it is possible that more than one person may have the power and intention to exercise control over a firearm. This is called joint possession. If you find that the defendant had such power and intention, then he possessed a firearm under this element even if he possessed it jointly with another. Proof of ownership of a firearm is not required.
>
> To satisfy this element, you must also find that the defendant knowingly possessed a firearm. This means that he possessed a firearm purposely and voluntarily, and not by accident or mistake. It also means that he knew that the weapon was a firearm, as we commonly use the word. However, the government is not required to prove that the defendant knew that he was breaking the law.

After deliberating, the jury found Defendant guilty of the lone count in the Indictment.

5

## II. STANDARDS OF REVIEW

### a. Rule 29

Federal Rule of Criminal Procedure 29 provides that after a jury verdict, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a); see also Fed. R. Crim. P. 29(c)(1)(allowing for such motions after jury verdicts).

"A defendant challenging the sufficiency of the evidence supporting a conviction faces a 'heavy burden.'" United States v. Glenn, 312 F.3d 58, 63 (2d Cir. 2002) (quoting United States v. Matthews, 20 F.3d 538, 548 (2d Cir. 1994)). On such motions, the Court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Espaillet, 380 F.3d 713, 718 (2d Cir. 2004)(quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

"[C]ourts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003). In this regard, the Court must avoid substituting its own determination of the weight of the evidence presented and the reasonable inferences that may be drawn from that evidence. Id. "Indeed, it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence." Id.; see also United States v. Florez, 447 F.3d 145, 154-155 (2d Cir. 2006)("In assessing sufficiency, we are obliged to view the evidence in its totality and in the light most favorable to the prosecution, mindful that the task of choosing among permissible competing inferences is for the jury, not a reviewing court.").

6

> "'[T]he relevant question is whether . . . any rational trier of fact could have
> found the essential elements of the crime beyond a reasonable doubt.'"
> Glenn, 312 F.3d at 63 (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.
> Ct. 2781, 61 L. Ed.2d 560 (1979)). A court's analysis considers "'the
> evidence in its totality,' and the Government 'need not negate every theory of
> innocence.'" Glenn, 312 F.3d at 63 (quoting United States v. Autuori, 212
> F.3d 105, 114 (2d Cir. 2000)). . . . The relevant inquiry is "'whether upon the
> evidence, giving full play to the right of the jury to determine credibility, weigh
> the evidence, and draw justifiable inferences of fact, a reasonable mind
> might fairly conclude guilt beyond a reasonable doubt.'" Autuori, 212 F.3d at
> 114 (quoting United States v. Mariani, 725 F.2d 862, 865 (2d Cir.1984)).

United States v. Triumph Capital Group, Inc., 544 F.3d 149, 158 (2d Cir. 2008).

"A conviction must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. If the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." United States v. Applins, 637 F.3d 59, 76 (2d Cir. 2011).

### b. Rule 33

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

> "Generally, a motion for a new trial 'should not be granted unless the trial
> court is convinced that the jury has reached a seriously erroneous result or
> that the verdict is a miscarriage of justice.'" Smith v. Carpenter, 316 F.3d
> 178, 183 (2d Cir. 2003) (quoting Atkins v. N.Y. City, 143 F.3d 100, 102 (2d
> Cir.1998)). A district court has "broad discretion ... to set aside a jury verdict
> and order a new trial to avert a perceived miscarriage of justice." United
> States v. Ferguson, 246 F.3d 129, 133 (2d Cir. 2001) (quoting United States
> v. Sanchez, 969 F.2d 1409, 1413 (2d Cir.1992)). Though a district court is
> entitled to "weigh the evidence and in so doing evaluate for itself the
> credibility of the witnesses," Sanchez, 969 F.2d at 1413 (internal quotation
> marks omitted), it "must strike a balance between weighing the evidence and
> credibility of witnesses and not 'wholly usurp[ing]' the role of the jury,"
> Ferguson, 246 F.3d at 133 (quoting Autuori, 212 F.3d at 120). While courts

7

> have "broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29," they "nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" Ferguson, 246 F.3d at 134 (quoting Sanchez, 969 F.2d at 1414).

Triumph Capital Group, Inc., 544 F.3d at 159.

## IV. DISCUSSION

### a. Rule 29

On the Rule 29 motion, Defendant argues that he is entitled to a judgment of acquittal because (1) the evidence demonstrated there were several others who had access to the residence and bedroom closet where the firearm was discovered; (2) Defendant did not have a key to the residence or sleep in the bedroom where the closet containing the firearm was located; (3) the DNA evidence indicated that several persons might have handled the weapon; (4) Detective Kiefer's recollection of what Defendant said to him in the police cruiser was cloudy; (5) Ms. Hughes testified that her estranged husband, in whose closet the shotgun was found, was a hunter; (6) shotgun shells were found in the garage among Ms. Hughes' estranged husband's belongings; and (7) there was no evidence that anyone ever saw Defendant with the weapon.

While Defendant makes a fair argument based on the evidence, the jury was free to reject the testimony that Ms. Hughes' estranged husband was a hunter, that the estranged husband's shotgun shells were found by Ms. Hughes and Defendant when the two were cleaning out the garage, and that Defendant merely happened upon the shotgun while he was looking for hair cutting clippers. The jury was also free to accept Detective Kiefer's testimony of what Defendant stated in the police cruiser.

Moreover, when viewing the evidence in the light most favorable to the prosecution,

and based on the evidence that Defendant exercised access to the home and bedroom closet where the firearm was located, Defendant's DNA evidence on the firearm indicating that he physically possessed the shotgun at some pont, and Defendant's spontaneous report to Detective Kiefer that there was a shotgun in the residence indicating his then-present knowledge of its existence within 102 Freund Street, there was sufficient evidence upon which a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In this regard, a rational jury could have found that, on October 6, 2010, Defendant "knowingly had the power and intention . . . to exercise dominion and control over" the shotgun. United States v. Chavez, 549 F.3d 119, 129 (2d Cir. 2008). Thus, the evidence was sufficient to establish that on the date alleged, Defendant constructively possessed, either solely or jointly with another, the Winchester, Model 1300, 12 gauge shotgun found in the second floor bedroom closet at 102 Freund Street. See United States v. Dhinsa, 243 F.3d 635, 676-77 (2d Cir. 2001);[6] United States

---

[6]The Second Circuit wrote in *Dhinsa*:

To sustain a conviction under section 922(g), the government need not prove that Dhinsa physically possessed the firearm; rather, proof of constructive possession is sufficient. *See United States v. Payton*, 159 F.3d 49, 56 (2d Cir.1998); *United States v. Rivera*, 844 F.2d 916, 925 (2d Cir.1988). "Constructive possession exists when a person has the power and intention to exercise dominion and control over an object." *Payton*, 159 F.3d at 56; *see also United States v. Walls*, 225 F.3d 858, 864 (7th Cir. 2000); *United States v. Moore*, 212 F.3d 441, 445 (8th Cir. 2000). In making this determination, courts examine, *inter alia*, whether the defendant exercised dominion and control "over the premises in which the firearms are located." *United States v. Layne*, 192 F.3d 556, 571 (6th Cir.1999), *cert. denied*, 529 U.S. 1029, 120 S. Ct. 1443, 146 L. Ed.2d 330 (2000); *see also United States v. Adkins*, 196 F.3d 1112, 1118 (10th Cir.1999), *cert. denied*, 529 U.S. 1030, 120 S. Ct. 1446, 146 L. Ed.2d 333 (2000); *United States v. Wight*, 968 F.2d 1393, 1398 (1st Cir.1992) (collecting cases). It is of no moment that other individuals also may have exercised control over the weapons. *See Payton*, 159 F.3d at 56; *United States v. Kitchen*, 57 F.3d 516, 521 (7th Cir.1995) ("Constructive possession may be either sole or joint."). The government may establish constructive possession through direct or circumstantial evidence. *See Payton*, 159 F.3d at 56.

9

v. Feger, 2012 WL 1040181, at *2-*3 (W.D.N.Y. March 28, 2012);[7] see also United States v. Finley, 245 F.3d 199, 203 (2d Cir. 2001)(constructive possession of a firearm was sufficient for a conviction under 18 U.S.C. § 924(c)); United States v. Jones, 531 F.3d 163, 168-69 (2d Cir. 2008) (constructive possession of narcotics was sufficient for a conviction under 21 U.S.C. § 841(a)(1)).  Further, the DNA evidence and Defendant's admission that he handled the shotgun two weeks before his arrest arguably establishes that he actually possessed the shotgun "on or about" the date alleged in the Indictment. See United States v. Thomas, 321 F.3d 627, 634 (7th Cir. 2003).[8]  Therefore, Defendant's Rule 29 motion is denied.

### b.  Rule 33

On the Rule 33 motion, Defendant argues that he is entitled to a new trial because (1) "[t]he Court erred in refusing to limit the testimony of Detective Kiefer to what was stipulated to by the parties during pretrial motion hearings;" and (2) "[t]he Court also erred in admitting DNA evidence in this case." Def. MOL pp. 15-20.  Both arguments are without merit.

### 1.  Suppression Motion "Stipulation."

Well before the trial in this matter, Defendant moved to suppress his statements

---

[7]("[A] conviction under § 922(g) may be sustained not only where the Government proves that Defendant physically possessed the firearm or ammunition, but also where he constructive possessed it. . . . To establish constructive possession, the Government must present sufficient indicia of dominion or control over the firearm or ammunition.")(interior quotations marks and citations omitted).

[8]("However, the government is not required to show how Thomas acquired the firearm, just that he had possession of one. Even if he held a gun only to inspect it, Thomas would be guilty under 18 U.S.C. § 922(g).")(citing United States v. Lane, 267 F.3d 715, 718 (7th Cir. 2001)("Once the gun is in the defendant's hands he need only pull the trigger, an act which can be completed in a split second and which is controlled and influenced by nothing more than the defendant's whim.")).

10

purportedly made to Detective Kiefer and Special Agent Thomas Rodriguez of the Bureau of Alcohol, Tobacco and Firearms. A suppression hearing was held before the Hon. Huge B. Scott, United States Magistrate Judge, on September 2011 and October 14, 2011. Detective Kiefer testified:

> We took [Defendant] into custody, brought him out to the car, and I sat in the car with him. At a point in time Deputy Marshal Tim Twarog arrived on the scene with a dog that is used for sniffing out guns. Mr. Gladden said that there were no drugs in the house. It was alluding -- I shouldn't say. Words to the effect of there's no drugs in the house, why is there a dog here? I said it's a gun dog. Going to go in and look for guns. Mr. Gladden said to me that there is -- the only gun in the house is upstairs. It's a legal gun. It was a long gun. I believe he said it was a shotgun. And it was legal for him to possess. It was in his house.

Oct. 14, 2011 Tr. p. 6.

Detective Kiefer testified that he got out of the car and reported to Special Agent Rodriguez what Defendant had stated. Special Agent Rodriguez then questioned Defendant.[9] However, because it was unclear whether Defendant was informed of his Miranda rights before Special Agent Rodriguez questioned him, the Government indicated that it would not offer Defendant's statement to Agent Rodriguez at trial. Instead, the Government indicated that it intended to offer only Defendant's statements to Detective Kiefer under the theory that the statements were spontaneous and not the product of a custodial interrogation. Id. pp. 17-18. Defense counsel appeared to agree with the Government's characterization of the statements to Detective Kiefer as being spontaneous, stating:

> I agree, Judge, and so the issue I think for the Court is which statements were made spontaneously. We have Agent Rodriguez saying one thing, that

---

[9]Special Agent Rodriguez's recollection of the events of October 6, 2010 were different than Detective Kiefer's recollection, but those differences are not material to the issue now before the Court.

11

there's a gun upstairs, and then Detective Kiefer says in addition to that, that it's legal, and et cetera. Now that contradicts what Rodriguez's recollection is. Rodriguez has a report to rely upon. Agent Kiefer has no report. All he's relying on is conversation with Rodriguez that's different from what he said now.

Id. at 18-19.

The Government took the position that there was no contradiction between the recollections of Detective Kiefer and Special Agent Rodriguez because they testified about "two different things," i.e., Detective Kiefer testified about Defendant's statements made to him alone, and Special Agent Rodriguez testified about Defendant's subsequent statements to him alone. Id. at 19-20. The Court then recounted some of the testimony from the witnesses, and the Government reiterated, "they're talking about two statements that were made." Id. at 21. The Court replied, "I think that the record will bear that out." Id. Defense Counsel then stated, "Judge, if that's what it is, there is a shotgun upstairs, then the issue is moot. It is what it is." Id. at 22.

Magistrate Judge Scott wrote a Report and Recommendation stating, *inter alia*,

At the conclusion of the suppression hearing, the government stated that in light of the uncertainty of whether the defendant was advised of his rights at the time of the arrest, the government would not offer any statements made by Gladden to Rodriguez into evidence at any trial in this matter. (Docket No. 13 at pages 17-18). However, the government stated that it would offer the statements made by Gladden to Kiefer as spontaneous admissions that were offered by the defendant and were not the product of custodial interrogation. (Docket No. 13 at page 18). After some discussion, the government agreed that the alleged statements by Gladden to the effect that the gun was not loaded and that it was not a crime for him to possess it were made to Rodriguez "alone" and that the government would not be "offering that statement". (Docket No. 13 at page 21). Counsel for the defendant stated that, in light of the government's representation, that it would only offer the statement made by Gladden to the effect that there was a shotgun upstairs, "then the issue [was] moot." (Docket No. 13 at page 22.). It appears that in light of the representations by the parties, the motion relating to the defendant's statements is moot.

12

Dec. 1, 2011 Rep. & Rec., p. 4.

Prior to trial, Defendant moved to preclude Detective Kiefer from testifying to any statement by Defendant other than "there is a shotgun upstairs," arguing that "it was the law of the case" as to what Detective Kiefer could testify to. <u>See</u> Second Mot. in Limine, pp. 1-3. The Court rejected the argument. <u>See</u> March 19, 2013 Tr., pp. 1-4. Defendant now moves for a new trial under Fed. R. Crim. P. 33, essentially re-arguing the motion made *in limine*. For the following reasons, the motion is denied.

First, Magistrate Judge Scott made no ruling or recommendation impacting the extent of Detective Kiefer's testimony relative to Defendant's statements, finding only that the issue of suppression of these statements was moot due to Defendant's concession that his statements to Detective Kiefer were not the product of custodial interrogation. The comment that the Government "would only offer the statement made by Gladden <u>to the effect that there was a shotgun upstairs</u>," when taken in context of the testimony at the hearing and the comments of counsel, indicates only that Magistrate Judge Scott understood the Government as expressing its intention to offer Detective Keifer's testimony *en toto* regarding Defendant's statement, not a limited portion of it.

Second, Defendant seemingly ignores his counsel's concession that "[w]e have Agent Rodriguez saying one thing, <u>that there's a gun upstairs</u>, and then Detective Kiefer says <u>in addition to that</u>, <u>that it's legal</u>, <u>and et cetera</u>." Oct. 14, 2011 Tr. pp. 18-19. Clearly, Defense Counsel spoke regarding Detective Kiefer's testimony as a whole (<u>i.e.</u>, that the shotgun was upstairs, that it was legal, "and et cetera"), not to a select portion of it. Thus, "the stipulation," if there was one, was that the statements to Detective Kiefer were not the product of custodial interrogation and, therefore, not subject to suppression for lack of

13

Miranda warnings.

Based on this background, the Court ruled, *in limine,* that Detective Kiefer would be allowed to testify as to what he recalled Defendant stated to him about the shotgun. See March 19, 2013 Tr., pp. 3-4. The Court finds no error with this ruling. Further, even if this ruling constituted some deviation from the parties' stipulation or a prior ruling in this matter, it did not create such an extraordinary circumstance as to warrant a new trial pursuant to Fed. R. Crim. P. 33. Defendant was on notice of the substance of Detective Kiefer's testimony, and had a full opportunity to cross examine him as to Defendant's purported statements. Moreover, Detective Kiefer's trial testimony[10] did not deviate substantially from what he testified to at the suppression hearing. See Oct. 14, 2011 Tr. p. 6.[11] It cannot be said that any deviation between the two statements created unfair surprise or denied Defendant a fair trial. The fact that Detective Kiefer testified to what he recalled Defendant stated on October 6, 2010 did not cause the jury to reach a seriously erroneous result or lead to a verdict that could be said to be a miscarriage of justice. Accordingly, Defendants' Rule 33 motion on this ground is denied.

### 2. DNA evidence

Defendant also moves under Fed. R. Crim. P. 33 for a new trial on the basis of the Court's decision to deny preclusion of the Government's DNA evidence. Again, the issue presented on the Rule 33 motion was the subject of prior motion practice. For the reasons that follow, the Court finds this Rule 33 argument to be without merit.

---

[10](that Defendant stated that the shotgun was in the house, was for protection, and was legal)

[11]("Mr. Gladden said to me that there is -- the only gun in the house is upstairs. It's a legal gun. It was a long gun. I believe he said it was a shotgun. And it was legal for him to possess. It was in his house.").

14

Well before trial, Defendant moved for a DNA admissibility hearing pursuant to Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 529 (1993), Dkt. # 36, which Magistrate Judge Scott construed as also seeking to suppress the DNA evidence. Sept. 20, 2012 Ord., Rep. & Rec., dkt. # 46, fn. 1. Magistrate Judge Scott recommended that the DNA evidence not be suppressed and that no admissibility hearing occur. See Ord, Rep. & Rec., dkt. # 46. In this regard, Magistrate Judge Scott opined that Defendant's challenge to the DNA evidence went to the weight of the opinion not its admissibility, and noted that "defendant can certainly cross-examine the government's expert, and present his own evidence in an attempt to persuade the trier of fact that the calculations by the Lab (which do not include all the test results) are inaccurate." Ord., Rep. Rec., dkt. # 46, pp. 3-4. Based on Magistrate Judge Scott's recommendation, Judge Skretny denied suppression of the DNA evidence. See Feb. 20, 2012 Text Order, dkt. # 48.

On March 13, 2013, six days before trial, Defendant again challenged the admissibility of the DNA evidence. See Motion to Suppress DNA Evid., dkt. # 66. Defendant argued:

> [D]efense counsel was emailed a brand-new DNA report. The report has radically different results from the prior report. The prior report, . . . dated February 13, 2012, held that the "probability of randomly selecting an unrelated individual with the matching DNA profile at the loci above is at least 1 in 9.55 billion for US individuals."
>
> The new report, dated February 28, 2013, but received by counsel on March 12, 2013, holds that the "probability of randomly selecting an unrelated individual with a DNA profile that matches the partial major DNA profile obtained from the shotgun swab is at least 1 in 581.4 million for US individuals." This is a huge difference (a factor of x 24) and calls into question the reliability of the science and/or of the laboratory applying the science. The report states that the new report is "issued with the new statistical thresholds currently in place at our laboratory."

15

Id., p. 3.

The Government represented that it had provided Defense Counsel the new report, which was more favorable to Defendant, as soon as the Government received it. It also noted that the new report did not change the data, but only provided an alternative method of interpreting the probability that another individual with DNA matching the DNA found on shotgun could be found in the United States. See March 19, 2013 Tr., pp. 7-8.

The Court determined that the Government had turned over the new report too late and, therefore, the opinion represented in the new report would not be admitted unless Defendant wanted it to come into evidence. Id. pp. 6-8. However, the Court also determined that because the original report had been in Defendant's possession for a sufficient period of time such to allow a defense expert to examine the data and its conclusions, there was no reason to preclude the Government from offering the DNA evidence represented in the original report. Id. pp. 8-10. The Court indicated that Defense counsel was free to cross-examine the Government's DNA expert on any discrepancy between the two reports. Id. p. 8.

As indicated above, Defendant asserts that this ruling was erroneous and, as a result, he is entitled to a new trial. The Court disagrees. Defendant had a full and fair opportunity to review and challenge the DNA expert's conclusion that Defendant's DNA was on the shotgun. As the Court understands it, that conclusion was unchanged by the new probability analysis. Thus, Defendant possessed well in advance of trial the Government's DNA expert's conclusion that his DNA was on the shotgun, and he had a full and fair opportunity to challenge that conclusion including by cross-examining the DNA expert as to any change in the probability analysis that another individual within the United

16

States might have the same DNA profile. Consequently, the Court finds no basis to conclude that Defendant was denied a fair trial, that the admission of the DNA evidence caused the jury to reach an erroneous result, or that the verdict in this matter constitutes a miscarriage of justice.

**IV.    CONCLUSION**

For the reasons set forth above, Defendant's motion for a judgment of acquittal or a new trial, dkt. # 78, is denied.

**IT IS SO ORDERED.**

Dated: May 8, 2013

_____
Thomas J. McAvoy
Senior, U.S. District Judge